No. 13,932.

HOUSTON RIVER CANAL COMPANY, LIMITED, VS. KOPKE, ROBICHEAUX & NICHOLS.

106  609
109 1045
106  609
,e113 837

## SYLLABUS.

1. Where persons hold themselves out, and allow themselves to be held out, as partners, to the public at large and to particular individuals, who, accordingly, deal with them in the belief that they are partners, they should be held liable as partners for all the purposes of such dealings.

2. The obligation of the clerks of the District Court, to issue subpœnas for witnesses upon the demands of the defendants in civil actions, is not affected by Article 472 of the Code of Practice. The matter is controlled by Act No. 203, of 1898, under which the clerks must look to the plaintiffs in such actions for their costs, and must issue such subpœnas as the defendants may require without exacting payment or security.

3. An irrigation company may be put in default, with respect to the water which it has contracted to furnish, by a verbal demand made by one member of a planting partnership in the presence of two other members; or, by a written demand, left at the camp of its "water boss," in the hands of a responsible person, during the absence of such boss.

4. Such company, in order to recover rental for water claimed to have been furnished under contract, must prove the contract, and the service in accordance therewith, and, where it is claimed that there was a partial performance, accepted by the lessees, any *pro tanto* recovery must be proportioned to definitely established benefits derived therefrom by the lessee, after deducting damages resulting from failure to perform in full. If the benefit cannot be clearly so established there can be no recovery.

APPEAL from the Fifteenth Judicial District, Parish of Calcasieu.—*Miller, J.*

*J. W. Bryan* and *Daniel B. Gorham* (*Holbert & Barret,* of Counsel), for Plaintiff, Appellant.

*Cline & Cline,* for Defendants, Appellees.

## STATEMENT OF THE CASE.

The opinion of the court was delivered by

MONROE, J.   The petition filed in this case alleges, in substance, that the plaintiff, through its duly authorized general manager, Samuel A. Robertson, entered into a verbal contract with the firm of "Kopke,

Robicheaux & Nichols," composed of L. J. Kopke, M. Robicheaux and Nichols, whereby the latter agreed to plant in rice, during the year 1900, certain tracts of land in the Parish of Calcasieu, and whereby the petitioner agreed to furnish the water necessary for the irrigation of such rice, and that, in consideration thereof, the parties named obligated themselves to deliver to petitioner, as soon as threshed, two sacks of rice, of average quality, per acre of all the rice lands contained in said tracts; that the water was supplied as agreed on, and that said parties defendant were thereby enabled to make a crop of rice on said land "of which fully 400 acres has been threshed and the balance is being threshed  *  *  *  and that said defendants refuse to deliver the rental due thereon." That petitioner has a lien and privilege on the entire crop to secure the payment of said two sacks per acre, and fears that defendants are about to remove it beyond the jurisdiction of the court, and that a writ of sequestration is necessary, etc.

The petition thereupon prays for the sequestration of 1,200 sacks of rice produced on the lands referred to and in the possession of the defendants, and for citation of L. J. Kopke, M. Robicheaux,—. Nichols, and of the firm of "Kopke, Robicheaux & Nichols," and for judgment against said firm, and the members thereof in solido, for twelve hundred sacks of rice, of average quality, raised on said land, with lien and privilege on the entire crop; or, in case defendants should not be able to deliver said rice, for $3,600, with interest. The writ issued as prayed for and 1,200 sacks of rice were seized, and were eventually bonded by the plaintiffs. Citations, addressed to the defendants, individually, were served on them, in person, and a citation addressed to "Kopke, Robicheaux & Nichols" was served on Robicheaux, as manager of said firm, and notices of seizure were served in the same way. Thereafter, the defendants excepted, that there is no such firm as "Kopke, Robicheaux & Nichols." They admit that the firm of "Kopke & Nicholas" planted rice, during the year 1900, upon the lands described in the petition, but they deny that any member of said firm is named Robicheaux, and said appearers also moved that the assignment, by the sheriff, of the bond, given by the plaintiff, for the release of the property seized, to "Kopke, Robicheaux & Nichols," be amended, accordingly. Some evidence appears to have been taken in support of the exception and motion, thus filed, and they were sustained; and a delay was allowed for the amendment of the petition, of which, how-

ever, the plaintiff declined to avail itself. "Kopke & Nicholas" then excepted that the said firm was the real party in interest and had not been cited, which exception being overruled, they answered, substantially, as follows, to-wit: "That said firm is an ordinary partnership, composed of L. J. Kopke and E. Nicholas, who are the real parties in interest as defendants to this suit. They admit that they entered into a contract with the plaintiff whereby the latter agreed to furnish an ample supply of water for the irrigation of their rice crop, and they agreed, in consideration thereof, to give, in payment, two sacks of average grade, rough, rice, for each acre of land irrigated, and they allege that they fulfilled their obligations under said contract, by planting 600 acres of land, but that the plaintiffs furnished no water for the irrigation thereof, and was placed in default with respect thereto by notice and warnings and frequent demands. They further allege that, had the plaintiff complied with its obligations in the premises, they would have made at least fifteen barrels of rice to the acre, worth $3.50 per barrel, or a total of $31,500, from which, deducting, $4,200, for water rental, and $4,500 for harvesting, marketing, etc., they would have derived a net profit of $22,800. They further allege that they expended $6,000 in making a crop, of about 1,800 barrels, worth $3.00 per barrel, and that they are entitled to recover, in reconvention, said $22,800, *plus* said $6,000, after deducting the value of the crop actually made.

They further allege that the writ of sequestration was wrongfully issued, because they owe the plaintiff nothing and plaintiff had no privilege on their rice, and for the additional reason that the writ issued against "Kopke, Robicheaux & Nichols," whereas the rice belongs to appearers; and that they have been injured thereby, in loss of credit and time and in expense, to the extent of $1,000, and in attorneys fees to the amount of $300, and they pray for judgment, rejecting plaintiff's demand and awarding them damages in the sum of $17,400.

Before entering upon the trial of the case, a question arose between the defendants and the clerk of the court, the clerk refusing to issue subpœnas for more than six witnesses unless the defendants furnished security for the costs, and the defendants ruling him into court to compel him to do so. The clerk answered, basing his refusal on C. P. 472, and the rule against him was discharged.

Upon the trial, on the merits, a large number of witnesses were

examined, and, from the mass of testimony adduced, we find the fol-
lowing facts, to-wit:

The defendants held themselves out to Robertson during the negotia-
tions which preceded their contract and throughout their dealings,
until the filing of the exception in this suit, as partners, and they were
so held out, and so believed to be in the neighborhood in which they
planted. Upon the other hand they claim, and so testify, that Kopke,
who remained in Texas, where they had planted in 1899, was to furnish
the money for their operations in Louisiana and one-half of the stock;
that Nicholas was to furnish his services on the farm and the other
half of the stock, and that Robicheaux was to furnish his services, as
manager on the farm, and that the net profits were to be divided in the
proportions of one-fourth to each, Robicheaux and Nicholas, and one-
half to Kopke, in addition to which, Robicheaux was to receive $15.00
per month. In the negotiations between the defendants and Rob-
ertson, and in the making of the contract, for land and water, the
former were ignorant of the latter's relations to the defendant com-
pany, and dealt with him in the belief that he was acting for himself,
or, possibly, for some firm, of the composition of which they were not
informed. The evidence does not show exactly how much land was
leased, but the pleadings concede that the defendants' liability for
water rent, upon the basis of two sacks of rice to the acre, irrigated, is
limited to six hundred acres, and it is shown that, of 2,005 sacks made
by them, they gave to Hunter Brothers, stockholders in the plaintiff
company, for the rent of the land, one-sixth, or 334 sacks. Prior to the
making of the contract, some discussion had taken place, between the
defendants and Robertson, as to whether the defendants should buy
land, or rent it, and as to the water supply, and, upon November 11,
1899, a letter was written by the authority of Robertson, and received
by Kopke in due course of mail, from which we make the following
excerpt, to-wit:

"Dear Sir.—Our Mr. Robertson has just returned and we hasten to
answer your letter of October 27th. Will say that we have secured
1,700 acres of the marsh land that you were looking for, and are willing
to sign water contract for the land. Will also say that you need have
no fear regarding the completion of the canal, as we will put force
enough on to finish the same in time, and as for labor * * * if
you wish to buy, you will have no trouble.

*          *          *          *          *          *          *

There will be no trouble in your renting 1,000 acres adjacent to the gulley if you do not care to buy," etc.

The defendants decided to rent, and not to buy, and the land rented, and planted, by them is situated in Sections 26 and 36 T. 9 S. R. 4 W., and S. 31, T. 9 S. R. 10, W. and S. 1, T. 10, S. R. 11 W., and lies in the gulley, referred to in the foregoing excerpts, which may be called the valley of the Choupique, and on both sides of the bayou of that name. The principal pumping station of the plaintiff company, from which the water supply was expected to be furnished, is located upon the Houston river in the S. E. ¼ of Sec. 11 T. 9 S. R. 10 W., being three miles to the north, and four miles and a half to the east, of the defendants' farm, and the water was to be supplied to the defendants by means of what are called "laterals," or small canals, running out from the main canal, which, latter, was to be constructed on a line running westward from the pumping station and lying about two and a half miles to the north of defendants' holdings. Late in the spring of the year, 1900, however, when the defendants' rice was beginning to need water, Robertson, who was engineer, as well as contractor, for the construction of the canals referred to, discovered that S. 17, T. 9 S. R. 10 W., through which the main canal was to pass, and which lies some three miles west of the pumping station, was so flooded with water, from excessive rains, as to render the construction of said canal impossible, it being necessary, in that territory, to build it on the surface of the ground by erecting twin levees or embankments, and it being impossible, at that time (as he states, meaning, no doubt, within the limits of what was considered reasonable, or profitable, expenditure), to obtain the earth for that purpose. He, therefore, concluded to make an effort to supply the water required by the defendants from another direction. To the northwestward of, and, perhaps, two miles distant from, the lands occupied by the defendants, beginning with the east line of S. 21, T. 9 S. R. 11 W., and extending still further in the direction mentioned. he had constructed a series of levees, with the view, originally, of forming, reservoirs, whereby to hold back the drainage from the extensive water sheds behind them and thus save the crops of the farmers. below, having relations with the company, from being destroyed by floods. And he attempted to utilize the water, held in the reservoirs thus established, for the irrigation which he found himself unable to accomplish by means of the canal, which was to have been built from the pumping station, and from the "laterals,"

which were to have been connected therewith. He was, however, as we concluded, from the evidence, taken at a disadvantage by the necessity of making use, suddenly, as, a source of water supply, of reservoirs which had not been established for that purpose, and, whether from lack of scientific information as to the topography of the country to be irrigated, considered with reference to the supply of water coming from an unexpected direction, or from other causes, the means adopted for such irrigation, proved, so far as these defendants are concerned, to be inadequate, although they were sufficient for some other farmers. On the map, prepared by Mr. Robertson, and filed in evidence on behalf of the plaintiff, he has not thought proper to distinguish between the completed canals and laterals, and those which are, or were, at the time of which we are writing, merely projected. The map, therefore, regarded as evidence, tends rather to confuse than to enlighten. Considering it, however, in connection with a sketch offered in behalf of the defendants, and with the oral testimony, we conclude that a lateral, partially constructed by the plaintiff, on the line between the S. E. ¼ of Sec. 26 and the S. W. ¼ of Sec. 25, but not completed, or connected with anything at either end, received some water, which was, practically, exhausted in supplying a Mr. Fell, whose farm was on Section 25, and who cut openings in the east levee of said lateral, under the instructions of Lewis, the plaintiff's "water boss." Robertson, in referring to this lateral, in his testimony, says: "The lateral between Sections 25 and 26 was not used for any purpose this year. It was merely an uncompleted mass of earth." Nevertheless, the defendants, themselves, at the suggestion, or with the concurrence, of Lewis, attempted to obtain water by building a conduit, of twin levees, from the reservoir, to connect with "the mass of earth," thus referred to, and the attempt seems to have been frustrated and abandoned on account of the permission, given by Lewis to Fell, to cut the lateral. Roberston claims to have made provision to supply the defendants with water by means of what is called the "Robicheaux ditch," which was extended from the reservoir, on Section 21, in a southerly direction, to a point, perhaps, a quarter of a mile to the westward of the westward limit of the S. E. ¼ of Sec. 26, where it is said to have terminated in what is spoken of as a "swale," or natural drain, continuing in the same direction. But the terminus was between a half mile and a mile from the nearest point of land cultivated by the defendants, and the W. ½ of the S. W. ¼ of Section 26 was lower than any of the land so·

cultivated, so that, the water, getting into it through the swale, could get out, by gravity, only over land which was lower still, or, else, by being pumped, or otherwise lifted. As a matter of fact, whilst some of it may have reached the defendants' fields, or might have been made available to them, we are unable to say how much, and are entirely satisfied that, upon the whole, the supply was inadequate.

Another source of supply, which the plaintiff claims to have afforded to the defendants, was by means of what is called the "Wilburn ditch," through Sections 22, 23, 24, to the Bayou Choupique. And the defendants did attempt to avail themselves of the water in the bayou, as they might have done, if the Wilburn ditch had not existed. But, in order properly, to irrigate some of their fields, by means of a dam across the bayou, it would have been necessary to submerge these next to the bayou to a depth of four feet. Besides which, as the bayou is the natural drain for a vast extent of territory, it is conceded that the dam would have to be removed, or a "spill-way" opened, after every rain. Early in June, the three defendants called upon the plaintiff's "water boss," whom they found sick in bed. and asked for water, which they informed him that their rice needed. They were told that he could not furnish it. They then asked him to lend them, or let them have, a gasoline pump, which appeared to be under his control, and he told them that they could have it, or the use of it, if they would haul it, from where it then was to the place at which they desired to erect it, and the defendants hauled the pump, built the foundations for it, and put it up, and it was operated for the benefit of some of their fields. which were entirely inaccessible to any water which plaintiff claims to have furnished, for forty-five days, at the end of which time it was taken away by plaintiff's general manager, who testifies that he needed it elsewhere. The oil used in running the pump was furnished, and the engineer was paid by the plaintiff, or by Robertson, but whether those expenses were charged to the defendants, as other supplies furnished to them were charged, or whether they were considered as having been disbursed in the discharge of the company's obligation to irrigate the defendants' lands, we are unable to say from the evidence.

Nor, are we able to determine how much of the land was thus irrigated, or in what proportion the water thus supplied, as compared with that obtained from other sources, contributed to the making, or saving, of the crop raised on such land. The pump appears to have been grudgingly furnished, late in the season, and to have been taken away, early,

at the convenience of the plaintiff's general manager. It also appears that the defendants attempted to prove that they made a demand for water by means of a written communication, addressed to plaintiff's "water boss," and delivered at his camp, in the hands of a person who was acting as his clerk, the "water boss" being absent at the time, and that the evidence was excluded. Our conclusion as to the plaintiff's attempts to comply with its obligations, in the matter of irrigating the defendants' farm, may be considered, fairly, expressed by the witness Philbrick, the only disinterested civil engineer who was examined, and the only individual who, by "running levels," had sufficiently informed himself of the topography of the land to be irrigated to be able to testify with anything like scientific accuracy. He states that he has been a civil engineer for thirty years, and that he occupies the position of chief engineer of several railroad and land companies, and that, in November, 1900, he visited the farm of the defendants and ran levels to determine the relative heights of the lands in different places, and measured some of the areas which had been cultivated in rice. He was repeatedly interrogated as to the practicability of irrigating the defendants' farm by means of the facilities and appliances which he found there (and which included all that the plaintiff claims to have provided), and his testimony upon the subject may be summed up in the following question and answer, to-wit: "Q. Would it be possible, with the appliances you found, to irrigate that farm, from any point to the northward? A. It wouldn't be possible to irrigate it at any point with the appliances that I found." Upon the other hand, the evidence shows that the defendants were very much cramped in their operations for lack of means, and the conviction is forced upon us that the result of those operations were seriously affected by that circumstance. It also appears that the crop was much injured by what is now known as the "Galveston" storm. In fact, Robicheaux stated to one or two persons that it had been damaged to the extent of 40 per cent. Considering all the testimony, together, we are satisfied that, as it was impossible for the plaintiff to show the extent to which the defendants were benefited by the inadequate supply of water furnished to them, so, it was, and is, impossible for the defendants to establish, with anything like reasonable certainty, the proportion of their loss which should be attributed to the fact that the supply of water furnished by the plaintiff was inadequate. The trial resulted in a judgment for defendants, rejecting plaintiff's demand and condemning it

to pay $250, as attorney's fees, incurred by defendants in obtaining the dissolution of the writ of sequestration. And both parties have appealed.

## OPINION.

Certain matters, interlocutory in their nature, and others which were so dealt with, lose their practical significance, in view of the conclusion reached upon the merits of this case, and will be passed on, not as affecting the general result, but because they are fairly presented, the action of the court is invoked with reference to them, and such action may serve as a guide in other litigation. If the plaintiff has no claim against either Kopke, Robicheaux, or Nicholas, whether as members of a firm composed of all three of them, or of only two of them, or against either of such firms, it can be a matter of no concern to it how such firms, or either of them, are composed. If the defendants obtain a judgment carrying all costs, it becomes a matter of no practical importance to them whether the clerk required them to advance costs for the summoning of their witnesses, in a case in which the plaintiff is able to respond to such judgment. If the evidence as to the *cause* of the damage, claimed by the defendants makes it clear that there can be no recovery as against the plaintiff, on that account, it becomes a matter of no consequence that other evidence, as to the *extent* of that damage, was excluded. For the reasons stated, however, the action of the trial judge in the matters referred to will be reviewed.

1. We are of opinion that the judge *a quo* erred in holding that the plaintiff was not entitled to prosecute its suit against the defendants as members of the firm of Kopke, Robicheaux & Nicholas. It is true that a mere agreement to share the profits is not conclusive as to the question of partnership, but we are inclined to think that the evidence justifies the conclusion that Robicheaux was to share profits, not as an employee, but as a principal, in which case, he should be held as a principal. But, conceding that, as between themselves, only two of the defendants were partners, it is shown that they held out, not only to the public, but to the plaintiff, that they were all interested, as principals and partners, and we think that, for the purposes of this suit, they should have been so held by the court, whether, as between themselves, they are partners or not.

2. We are of opinion that our learned brother of the District Court erred in discharging the rule, taken by defendants, plaintiffs in recon-

vention, on the clerk, to compel that officer to issue subpœnas for their witnesses, in excess of six. The question is not controlled by C. P. 472, which relates, only, to the mileage and *per diem* of the witnesses, but by Act No. 203, of 1898, Section 5, of which authorizes the clerks of the District Courts, throughout the State, to demand security from the plaintiffs in civil actions, and to obtain executions against them and their sureties for all costs incurred in such actions.

3.   The evidence, we think, establishes, conclusively, that W. R. Lewis was the authorized agent and representative of the plaintiff in the matter of supplying water for irrigation, hence, the plaintiff should have been held bound by a demand for water, made upon him, by the defendants, under their contract, and for the purpose of putting the plaintiff in default; and such demand could, properly, have been made by means of a written communication, delivered to such agent, in person, or left at the place of business occupied by him in his representative capacity in the hands of a responsible person, or, else, it could have been made, and the evidence shows that it was made, verbally, in the presence of two witnesses, our opinion being, that, in such case, where a demand is made on behalf of a firm, by one of its members, in the presence of two other members, the latter are competent witnesses, as they are, under the law, as it now exists, with respect to any other matter in which their firm may be interested. The defendants should, therefore, have been permitted to prove the demand made by letter, and, upon the basis of the verbal demand shown to have been made, in the presence of the three defendants, should have been permitted to offer evidence as to the extent as well as the cause of the loss of which they complain.

Upon the merits of the case, it is clear that the plaintiff, in order to recover, is bound to show that the defendants entered into the contract sued on, and that it, the plaintiff, rendered the services under that contract for which it demands compensation. The evidence in regard to the contract, itself, is general in its terms, but, probably, not more so than was the understanding of the parties. The plaintiff was to supply water for the irrigation of the rice which the defendants were to plant and cultivate. and the defendants were to give in payment therefor two sacks of rough rice. of average quality, for each acre of land so irrigated. Something is said, here and there. as to the defendants' obligation to cultivate 1,000 acres. but there is no demand in the pleadings, or elsewhere, predicated upon such, supposed, obligation, and we take

it as conceded that the 600 acres, with respect to which the claim is made, and which the defendants admit having had in cultivation, is all that the contract called for. The evidence shows that it was understood, at the time of the making of the contract, and afterwards, that the water was to be supplied by means of main, and lateral, canals, extending from the plaintiff's pumping station, on the Houston river, to the defendants' farm, but it is not seriously denied that the plaintiff could have fulfilled its obligation by delivering water from some other source, and by some other means, provided the delivery was made in accordance with such contract. The mere fact, therefore, that the water was obtained from the reservoir, and not from the river, would have afforded the defendants no just cause for complaint.

The question of the place of delivery was one which was entirely within the control of the parties, but, in the absence of any convention, or particular agreement, it seems to us that the obligation rested upon the plaintiff to make the delivery at such a point, within, or upon the borders of, the land to be irrigated, as to enable the defendant to utilize it with the greatest facility, and at the least expense. In most cases, this object would, probably, be accomplished by delivering the water at the highest point on the borders of the lessee's farm, but there might be particular instances in which this would not be so. And it seems reasonably certain that in no case could the lessor comply with his obligation to furnish the water required for the purpose of irrigation by delivering such water at the lowest point on the land of the lessee, thus subjecting the latter to the expense of lifting, or "pushing," it to his more elevated fields. The delivery of water through the "Wilburn" ditch, with the effect, so far as the defendants are concerned, merely, of swelling Bayou Choupique, which flowed through the lowest part of their farm, and, by reason of frequent rains, would, in any event have been filled with water, was not, therefore, a delivery under the plaintiff's contract. As to the lateral, between the Sections 25 and 26, the plaintiff's "water boss," evidently, led, or encouraged, the defendants to believe that it might be utilized for their advantage, and they went to the trouble and expense of constructing a waterway (consisting of twin levees), partly upon land other than that occupied by them, in order to connect it with the plaintiff's reservoir, but abandoned the idea upon finding that they had no way of preventing their neighbor, to the north, from drawing the water off through cuts, which the "water boss" authorized him to make in the lateral. Robertson,

the engineer and general manager of the plaintiff company, differing, altogether, from the "water boss," admits that the lateral in question was of no practical value, and characterizes it merely as a "mass of earth." In any case, however, the fact that the defendants were willing to undertake the construction of a waterway over the land beyond the boundaries of their own farm indicates very strongly that they needed water which they were not obtaining through the appliance provided by the plaintiff.

The "Robicheaux" ditch did not accomplish the purpose for which it was intended, and Philbrick, who, alone, ran levels upon the land, testifies that it could not have done so, whilst Robertson, who caused the ditch to be made only to the entrance of what is called a "swale," at a point between a half and three quarters of a mile from the defendants' nearest rice fields, had run no levels and derived his impression that the water would pass through the swale to or over the defendants' farm only from the fact that he had seen water running in that direction. The evidence shows that there were occasions when the whole country was flooded, either from excessive rains or from the breaking of plaintiff's reservoir, and it may be that such was the condition when he made his observation. However that may be, we have found as a fact that the "Robicheaux" ditch was not an appliance by means of which the defendants could have irrigated their rice crop, though it is not unlikely that it supplied some water to some of their fields.

The gasoline pump was used for pumping water from Bayou Choupique. It was loaned to the defendants by Lewis, the "water boss," but Robertson, as soon as he heard of it, objected, and subsequently, at his convenience, and not at the convenience of the defendants, took the pump away, because he wanted it for some other purpose. That the defendants derived some benefit from its use, there can be no doubt, but the fact that the plaintiff furnished the fuel and paid the engineer during the forty-five days that the pump was operated was certainly not a fulfillment of its contract as a whole, nor was it such a partial fulfillment as to entitle the plaintiff to a *pro tanto* recovery. The particular fields affected needed water before the pump was obtained, and needed it after the pump was taken away, and it is impossible from the testimony in the record to measure the effect of the water furnished by the pump, and we find it also impossible to determine the acreage reached by such water. Moreover, the circum-

stances connected with the obtention of the pump by the defendants themselves and its enforced surrender leave it a matter of doubt whether the pump was not merely loaned or hired and the fuel and services of the engineer furnished, as other things were furnished, by Robertson, or the company, entirely apart from the water contract. It may be that the plaintiff has a claim against the defendants on that account, but it is not involved in this suit.

We, therefore, conclude that the plaintiff is not entitled to recover, and that the writ of sequestration was properly dissolved and the suit properly dismissed. We are also of opinion that the judge *a quo* has done justice between the parties in the matter of the damages claimed by the defendants in their reconventional demand.

The judgment appealed from is therefore affirmed, the costs of the appeal to be borne by the parties in equal proportions.

Rehearing refused.